**Rodney COLEMAN, Plaintiff,**

v.

**HOUSTON LIGHTING AND POWER COMPANY, Defendant.**

**Civil Action No. H–96–2243.**

United States District Court, S.D. Texas.

Nov. 6, 1997.

John W. Donovan, Houston, TX, for Plaintiff.

L. Chapman Smith, Baker and Botts, Houston, TX, for Defendant.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

Pending before the court is Defendant Houston Lighting and Power Company's ("HL&P") Motion for Summary Judgment (# 13). HL&P seeks summary judgment on Plaintiff Rodney Coleman's ("Coleman") claims asserting employment discrimination under the Americans with Disability Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* HL&P contends that Coleman's failure to exhaust administrative remedies bars this action.

Having reviewed the motion, the submissions of the parties, the pleadings, and the applicable law, this court is of the opinion that HL&P's motion for summary judgment should be denied.

### I. *Background*

Coleman, an African–American, was employed by HL&P for fourteen years, where he held the position of Journeyman Line Mechanic. Coleman claims to have developed osteoarthritis in his left knee as a result of a 1986 injury and surgery. On February 26, 1995, Coleman received an unsatisfactory work evaluation from his supervisor, Dan Vesley ("Vesley"). According to Coleman, in March 1995, he complained to Vesley about the evaluation, which Coleman viewed as "totally false and arbitrary," but Vesley refused to take any corrective action. Despite his dissatisfaction with Vesley's decision, Coleman did not complain to another supervisor or pursue other internal remedies.

While Coleman did not have an individual employment contract with HL&P, he was covered by the collective bargaining agree-

ment between HL&P and the International Brotherhood of Electrical Workers, Local Union No. 66 ("the CBA"). The preamble to the CBA, entitled "Purpose," states, "There shall be no unlawful discrimination against any employee by the Company, Union, or any other employee because of race, color, disability, religion, age (over 40), sex or national origin." Article XVI of the CBA outlines the grievance and arbitration procedure. Section 1 defines a grievance as, "any dispute involving the proper application or interpretation of this Agreement, or a claim that an employee has been unreasonably and unjustly discriminated against." Section 2 provides a three-step grievance procedure:

STEP 1. Except as provided herein, a grievance shall first be presented within not more than five (5) days after it occurs to the immediate supervisor of the aggrieved employee, either by said employee or by the Union.... Said supervisor shall answer the grievance within not more than three (3) days from the time it first is presented to him.

STEP 2. If the decision of the immediate supervisor is not satisfactory, then the aggrieved employee or the Union may present the grievance in writing to the Department Head not later than five (5) days after the immediate supervisor has given his decision, and the Department Head shall answer said grievance in writing not later than five (5) days after the same first is presented to him. Grievances shall not be written on Company time.

STEP 3. If the decision of the Department Head is not satisfactory, then the aggrieved employee or the Union may present the grievance in writing to the Company's President, or to such representative as he may designate, not later than five (5) days after the Department Head has given his decision on the grievance, and the President or his representative shall answer said grievance in writing, not later than five (5) days after the same first is presented to him.

Section 3 of Article XVI of the CBA states:

Any grievance not presented within the time limits specified in this article shall be conclusively deemed to have been waived.

Failure of any Company representative to render a decision of a grievance presented to him within the time limit specified above shall, at the expiration of said time, be construed as constituting a declination of said grievance.

Under Section 4, once the grievance process is completed:

In the event the Union is dissatisfied with the decision of the President or his representative, it may invoke arbitration of said grievance by giving the Company written notice, within not more than ten (10) days from the date of the aforesaid decision, of a desire to arbitrate the grievance.

\* \* \* \* \* \*

The sole function of the arbitrators shall be to determine whether Company or Union is correct with reference to the proper application and interpretation of this Agreement and the arbitrators shall not have any authority to change, amend, modify, supplement or otherwise alter in any respect whatsoever this Agreement, or any part thereof.

\* \* \* \* \* \*

A decision of the arbitrators, signed by at least two (2) of them, shall be final and binding upon both parties.

Each party to the arbitration shall bear its own expenses, except that the fee and expenses of the third (3) arbitrator shall be paid equally by the Company and Union.

Coleman claims that he notified his immediate supervisor about his grievance in accordance with Section 2, Step 1 of the CBA, but he did not pursue the remainder of the grievance and arbitration procedure. Instead, Coleman resigned his employment on September 18, 1995, and filed a charge with the Equal Employment Opportunity Commission ("EEOC"), on November 1, 1995, alleging discrimination on the basis of his race and disability. The EEOC issued him a right-to-sue letter on April 12, 1996. Coleman initiated this action on July 10, 1996, seeking payment for lost wages, as well as compensatory and punitive damages, prejudgment and postjudgment interest, costs, and attorneys' fees. On March 7, 1997, HL&P filed the instant motion for summary judgment.

## II. *Analysis*

### A. *The Standard for Summary Judgment*

Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for his motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which he believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Williams v. Adams,* 836 F.2d 958, 960 (5th Cir.1988). The moving party, however, need not negate the elements of the nonmovant's case. *See Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1047 (5th Cir.1996) (citing *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994)).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing the existence of a genuine issue for trial. *See Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Anderson,* 477 U.S. at 257, 106 S.Ct. at 2514–15; *Wallace,* 80 F.3d at 1047; *Little,* 37 F.3d at 1075. The controverted evidence must be viewed in the light most favorable to the nonmovant, and all reasonable doubts must be resolved against the moving party. *See Palmer v. BRG of Ga., Inc.,* 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 402 n. 5, 112 L.Ed.2d 349 (1990); *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14; *Judwin Properties, Inc. v. United States Fire Ins. Co.,* 973 F.2d 432, 435 (5th Cir.1992). Nevertheless, "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden." *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1429 (5th Cir.1996) (citing *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994)); *see Wallace,* 80 F.3d at 1047; *Little,* 37 F.3d at 1075. Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof at trial. *See Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. at 2552. "In such situation, there can be 'no genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23, 106 S.Ct. at 2552.

### B. *Failure to Exhaust Contractual Remedies*

HL&P asserts that Coleman is precluded from maintaining this action because he failed to exhaust the grievance and arbitration procedures set forth in the CBA before filing suit. Coleman contends, however, that his claims under the ADA and Title VII are statutory causes of action independent of the provisions of the CBA, rendering exhaustion of the contractual remedies unnecessary.

#### 1. *Supreme Court Precedent*

This case highlights the tension between two Supreme Court decisions delineating the role and effect of arbitration agreements in the resolution and enforcement of an individual's claims of employment discrimination under various federal statutes. *See Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). In *Alexander,* an African–American employee instituted an action under Title VII alleging that his discharge was racially motivated. *See Alexander,* 415 U.S. at 43, 94 S.Ct. at 1017. Prior to filing suit, he had unsuccessfully challenged his discharge on racial grounds under the grievance/arbitration procedure established in the collective bargaining agreement in force between his union and his employer. *See id.* at 42, 94 S.Ct. at 1016–17. The Supreme Court held that the adverse arbitral decision neither foreclosed Alexan-

der's right to sue nor divested the federal courts of jurisdiction. *See id.* at 36, 94 S.Ct. at 1013–14.

The *Alexander* Court distinguished an employee's individual statutory rights from any contractual rights he may have as an employee under a collective bargaining agreement:

In submitting his grievance to arbitration, an employee seeks to vindicate his contractual right under a collective-bargaining agreement. By contrast, in filing a lawsuit under Title VII, an employee asserts independent statutory rights accorded by Congress. The distinctly separate nature of these contractual and statutory rights is not vitiated merely because both were violated as a result of the same factual occurrence. And certainly no inconsistency results from permitting both rights to be enforced in their respectively appropriate forums.

*Id.* at 49–50, 94 S.Ct. at 1020–21. The Court rejected the notion that an employee can prospectively waive his right to pursue his statutory claims in federal court by virtue of the terms of a collective bargaining agreement:

We are also unable to accept the proposition that petitioner waived his cause of action under Title VII. To begin, we think it clear that there can be no prospective waiver of an employee's rights under Title VII. It is true, of course, that a union may waive certain statutory rights related to collective activity, such as the right to strike. These rights are conferred on employees collectively to foster the processes of bargaining and properly may be exercised or relinquished by the union as collective-bargaining agent to obtain economic benefits for union members. Title VII, on the other hand, stands on plainly different ground; it concerns not majoritarian processes, but an individual's right to equal employment opportunities. Title VII's strictures are absolute and represent a congressional command that each employee be free from discriminatory practices. Of necessity, the rights conferred can form no part of the collective-bargaining process since waiver of these rights would defeat the paramount congressional purpose be-

hind Title VII. In these circumstances, an employee's rights under Title VII are not susceptible of prospective waiver.

*Id.* at 51–52, 94 S.Ct. at 1021–22 (citations omitted). In light of these considerations, the Supreme Court concluded that "the federal policy favoring arbitration of labor disputes and the federal policy against discriminatory employment practices can best be accommodated by permitting an employee to pursue fully both his remedy under the grievance-arbitration clause of a collective-bargaining agreement and his cause of action under Title VII." *Id.* at 59–60, 94 S.Ct. at 1025.

Following the reasoning of *Alexander,* the Supreme Court subsequently held that truck drivers' wage claims under the Fair Labor Standards Act ("FLSA") were not barred by the prior submission of their grievances to arbitration under the dispute resolution procedure contained in their collective bargaining agreement. *See Barrentine v. Arkansas–Best Freight Sys., Inc.,* 450 U.S. 728, 745, 101 S.Ct. 1437, 1447, 67 L.Ed.2d 641 (1981). The Supreme Court also determined that in a civil rights action brought by a former police officer under 42 U.S.C. § 1983, a federal court should not afford *res judicata* or collateral estoppel effect to an award in an arbitration proceeding brought pursuant to the terms of a collective bargaining agreement. *See McDonald v. West Branch,* 466 U.S. 284, 292, 104 S.Ct. 1799, 1804, 80 L.Ed.2d 302 (1984).

In *Gilmer,* however, the Supreme Court held that a discharged employee's claim under the Age Discrimination in Employment Act ("ADEA") could be subjected to compulsory arbitration pursuant to an arbitration agreement contained in a securities registration application. *See* 500 U.S. at 35, 111 S.Ct. at 1656–57. As a condition of his employment, Gilmer registered as a securities representative with several stock exchanges. *See id.* His registration application provided, among other things, that he " 'agree[d] to arbitrate any dispute, claim or controversy' arising between him and [his employer] 'that is required to be arbitrated under the rules, constitutions or by-laws of the organizations with which [he] register[ed].' " *See id.* at 23,

111 S.Ct. at 1650–51. Rule 347 of the New York Stock Exchange provided for arbitration of "[a]ny controversy between a registered representative and any member or member organization arising out of the employment or termination of employment of such registered representative." *See id.*

The Supreme Court, citing cases decided under the Sherman Act, the Securities Act of 1933, the Securities Exchange Act of 1934, and the Racketeer Influenced and Corrupt Organizations Act, stated, "It is by now clear that statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the [Federal Arbitration Act] ('FAA')." *Id.* at 26, 111 S.Ct. at 1652. The Court noted that " '[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.' " *Id.* (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985)). The Court observed that while not all statutory claims may be appropriate for arbitration, " '[h]aving made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.' " *Id.* (quoting *Mitsubishi Motors Corp.,* 473 U.S. at 628, 105 S.Ct. at 3355). Having failed to meet that burden, Gilmer was confined to pursuing his age discrimination claim in arbitration. *See id.* 500 U.S. at 35, 111 S.Ct. at 1656.

The Supreme Court did not overrule *Alexander,* but, instead, distinguished *Alexander* and its progeny, *Barrentine* and *McDonald. See id.* In discussing *Barrentine* and *McDonald,* the Court explained, "In holding that the statutory claims there were not precluded, we noted, as in *Gardner–Denver,* the difference between contractual rights under a collective-bargaining agreement and individual statutory rights, the potential disparity in interests between a union and an employee, and the limited authority and power of labor arbitrators." *Id.* The Supreme Court elaborated:

> There are several important distinctions between the *Gardner–Denver* line of cases

and the case before us. First, those cases did not involve the issue of the enforceability of an agreement to arbitrate statutory claims. Rather, they involved the quite different issue whether arbitration of contract-based claims precluded subsequent judicial resolution of statutory claims. Since the employees there had not agreed to arbitrate their statutory claims, and the labor arbitrators were not authorized to resolve such claims, the arbitration in those cases understandably was held not to preclude subsequent statutory actions. Second, because the arbitration in those cases occurred in the context of a collective-bargaining agreement, the claimants there were represented by their unions in the arbitration proceedings. An important concern therefore was the tension between collective representation and individual statutory rights, a concern not applicable to the present case. Finally, those cases were not decided under the FAA, which, as discussed above, reflects a 'liberal federal policy favoring arbitration agreements.' *Mitsubishi,* 473 U.S. at 625, 105 S.Ct. at 3352–53. Therefore, those cases provide no basis for refusing to enforce Gilmer's agreement to arbitrate his ADEA claim.

*Id.* In a subsequent decision, the Supreme Court confirmed that *Gilmer* did not overrule *Alexander,* stating, "Gilmer emphasized its basic consistency with our unanimous decision in *Alexander.*" *Livadas v. Bradshaw,* 512 U.S. 107, 128 n. 21, 114 S.Ct. 2068, 2080, 129 L.Ed.2d 93 (1994).

### 2. *Fifth Circuit Precedent*

The Fifth Circuit followed *Gilmer* in holding that arbitration agreements contained in securities registration applications were enforceable under the FAA and precluded judicial consideration of terminated employees' claims of employment discrimination under the ADEA and Title VII. *See Williams v. Cigna Fin. Advisors, Inc.,* 56 F.3d 656, 660 (5th Cir.1995); *Alford v. Dean Witter Reynolds, Inc.,* 939 F.2d 229, 230 (5th Cir.1991). Recently, the Fifth Circuit extended *Gilmer* to encompass arbitration clauses contained in individual employment contracts. *See Miller v. Public Storage Management, Inc.,* 121 F.3d 215, 218 (5th Cir.1997); *Rojas v. TK*

*Communications, Inc.,* 87 F.3d 745, 749 (5th Cir.1996). The court held that under the FAA, the arbitration clauses in question mandated the arbitration of the plaintiffs' ADA and sexual harassment claims. *See Miller,* 121 F.3d at 218; *Rojas,* 87 F.3d at 749. The court rejected the employees' arguments that their employment contracts did not fall within the ambit of the FAA. *See Miller,* 121 F.3d at 218; *Rojas,* 87 F.3d at 748. In *Miller,* however, the court acknowledged its prior holding that a collective bargaining agreement was a contract of employment excluded from the application of the FAA. 121 F.3d at 218 (citing *Lincoln Mills v. Textile Workers Union,* 230 F.2d 81, 86 (5th Cir.1956), *rev'd on other grounds,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957)). In *Lincoln Mills,* the Fifth Circuit found that the FAA "does not authorize the judicial enforcement of a contractual undertaking to submit to arbitration grievances arising under a collective bargaining agreement." 230 F.2d at 86. In *Miller,* the court distinguished *Lincoln Mills* from the facts in that case, explaining, *"Lincoln Mills* ... focused on the enforceability of an arbitration clause in a collective bargaining agreement, a completely different situation than that presented here." *Miller,* 121 F.3d at 218. In fact, in a case that pre-dated the *Alexander* decision, the Fifth Circuit held that an employee's invocation of remedies under a collective bargaining agreement did not bar him from seeking relief for race discrimination in federal court under Title VII. *See Hutchings v. U.S. Indus., Inc.,* 428 F.2d 303, 313–14 (5th Cir.1970).

In 1994, however, the Fifth Circuit found that *Gilmer* applied to a railroad worker's action asserting a sex discrimination claim under Title VII as well as state law claims, holding her claims to be subject to mandatory arbitration under the Railway Labor Act ("RLA"). *See Hirras v. National R.R. Passenger Corp.,* 10 F.3d 1142, 1147 (5th Cir.), *vacated,* 512 U.S. 1231, 114 S.Ct. 2732, 129 L.Ed.2d 855 (1994). Although Hirras was covered by a collective bargaining agreement, the court specifically noted that unlike most such agreements, "the RLA guarantees Hirras the right to present her claim, either with or without union involvement, to the

[National Railroad Adjustment Board]." *Id.* at 1147. The Fifth Circuit also pointed out:

Initially, we note that the duty to arbitrate here arises not from any agreement between the parties, but rather from the RLA itself. Moreover, because the specific statutory basis for arbitration of disputes between a railroad and its employees under the RLA is more compelling than the FAA's general applicability to the agreements at issue in *Gilmer* and *Alford,* the basis for concluding that Hirras' Title VII claim is subject to the RLA's arbitration procedures is stronger here.

*Id.* Nevertheless, the Supreme Court granted *certiorari* in *Hirras,* vacated the judgment, and remanded the case to the Fifth Circuit for further consideration in light of *Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994). On remand, the Fifth Circuit reversed the district court's rulings as to *Hirras's* state law and Title VII claims, noting that the defendant had waived its contention that arbitration of the Title VII claim was required. *See Hirras v. National R.R. Passenger Corp.,* 44 F.3d 278, 280 (5th Cir.1995).

Thus, subsequent to the Supreme Court's decision in *Gilmer,* the Fifth Circuit has not addressed the issue presented here-whether an employee must comply with the grievance and arbitration procedures contained in a collective bargaining agreement before filing suit in federal court under the ADA or Title VII. The district courts within the Fifth Circuit are split on this issue. The most recent decisions have held that an employee covered by a collective bargaining agreement, who has failed to exhaust his contractual remedies, may still seek judicial relief for violations of federal employment discrimination statutes. *See, e.g., Citchens v. Bellsouth Telecommunication, Inc.,* No. 2:96CV33–B–B, 1997 WL 570855, at *2 (N.D.Miss. Sep.3, 1997); *Darby v. North Miss. Rural Legal Servs., Inc.,* No. L:96CV214–B–A, 1997 WL 88241, at *2 (N.D.Miss. Feb.28, 1997); *Bynes v. Ahrenkiel Ship Management, Inc.,* 944 F.Supp. 485, 487–88 (W.D.La.1996); *Hill v. American Nat'l Can Co.,* 952 F.Supp. 398, 408 (N.D.Tex.1996); *Bush v. Carrier Air Conditioning,* 940 F.Supp. 1040, 1046

(E.D.Tex.1996). Finding that *Alexander* remains the controlling law, these courts rejected the notion that an employee's statutory claims must be submitted to an arbitral rather to a judicial forum, noting that an individual's statutory rights may not be prospectively waived by the inclusion of an arbitration clause in a collective bargaining agreement. *See Citchens,* 1997 WL 570855, at *2; *Darby,* 1997 WL 88241, at *2; *Hill,* 952 F.Supp. at 406; *Bush,* 940 F.Supp. at 1043–45. The two cases in which arbitration of an employee's statutory claims was found to be mandatory contain no discussion of the *Alexander/Gilmer* dichotomy or attempt any analysis of the distinctions found to be controlling in *Gilmer. See Dickerson v. United Parcel Serv., Inc.,* No. 3:95–CV–2143–D, 1996 WL 806696, at *2 (N.D.Tex. Oct.24, 1996); *Reece v. Houston Lighting & Power Co.,* No. H–95–1025, 1995 WL 862342, at *3–4 (S.D.Tex. Aug.10, 1995). The more thoroughly reasoned opinions, therefore, indicate that an employee's failure to exhaust contractual remedies under a collective bargaining agreement does not bar him from filing suit to assert federal statutory discrimination claims.

### 3. *Views of Other Circuits*

The majority of the courts of appeal that have considered the issue, likewise, have found that employees covered by collective bargaining agreements containing arbitration clauses retain the right to pursue statutory employment discrimination claims in federal court without exhausting their contractual remedies. *See, e.g., Penny v. United Parcel Serv.,* 128 F.3d 408, 413–14 (6th Cir.1997); *Brisentine v. Stone & Webster Eng. Corp.,* 117 F.3d 519, 526–27 (11th Cir.1997); *Harrison v. Eddy Potash, Inc.,* 112 F.3d 1437, 1453–54 (10th Cir.), *petition for cert. filed,* 66 U.S.L.W. 3137 (U.S. Aug. 6, 1997) (No. 97–232); *Pryner v. Tractor Supply Co.,* 109 F.3d 354, 363–64 (7th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 294, 139 L.Ed.2d 227 (1997); *Varner v. National Super Mkts., Inc.,* 94 F.3d 1209, 1213 (8th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 946, 136 L.Ed.2d 835 (1997); *see also Tran v. Tran,* 54 F.3d 115, 117–18 (2d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1417, 134 L.Ed.2d 542 (1996) (FLSA claim). "[T]he majority view is that *Alexander* and its progeny 'remain good law and that statutory employment claims are independent of a collective bargaining agreement's grievance and arbitration procedures.'" *Harrison,* 112 F.3d at 1453.

Only the Fourth Circuit has reached a contrary result, holding that an arbitration clause contained in a collective bargaining agreement was enforceable, thus precluding an employee from filing suit against her employer under Title VII and the ADA. *See Austin v. Owens–Brockway Glass Container, Inc.,* 78 F.3d 875, 885–86 (4th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 432, 136 L.Ed.2d 330 (1996). Citing six cases in which arbitration was compelled, the *Austin* majority noted that "the only difference between these six cases and this case is that this case arises in the context of a collective bargaining agreement." 78 F.3d at 885. The dissent in *Austin* observed, "The majority fails to recognize, however, that the only difference makes all the difference. A labor union may not prospectively waive a member's individual right to choose a judicial forum for a statutory claim." *Id.* at 886. Recently, the Fourth Circuit retreated somewhat from its holding in *Austin,* finding that an employee was not required to submit her claims under Title VII and the Family and Medical Leave Act to an arbitral forum. *See Brown v. Trans World Airlines,* 127 F.3d 337, 342 (4th Cir.1997). The *Brown* court attempted to distinguish *Austin* on the basis that the scope of the arbitration clause in *Brown* was narrower than in *Austin. See id.* at 340–41. The court, however, specifically rejected an interpretation of the collective bargaining agreement that "obliterate[d] the distinction between statutory and contractual claims based on a commonality of underlying facts." *Id.* at 342. The court observed:

> The possibility that the facts underlying Brown's claims of statutory violation might also give rise to a claim for breach of the anti-discrimination provision of the collective bargaining agreement is not itself sufficient to subsume Brown's statutory claims into the contract's arbitration clause or otherwise transform the statutory

claims into an unpleaded breach of contract action.

*Id.*

### 4. *Statutory Language and Legislative History*

In support of its position that arbitration is mandatory, HL&P cites provisions added in the early 1990s to Title VII, the ADEA, and the ADA that "where appropriate and to the extent authorized by law, ... arbitration ... is encouraged to resolve disputes arising under" these laws. Pub L. No. 102–166, § 118, 105 Stat. 1071, 1081 (1991); 42 U.S.C. § 12212. The legislative history reflects, however, that Congress intended to encourage only voluntary agreements to arbitrate and did not view arbitration clauses contained in collective bargaining agreements to fall within the rubric of "voluntary":

> It is the intent of the conferees that the use of these alternative dispute resolution procedures is completely voluntary. Under no condition would an arbitration clause in a collective bargaining agreement or employment contract prevent an individual from pursuing their rights under the ADA.

H.R. Conf. Rep. No. 596, 101st Cong.2d Sess. 89 (1990), *reprinted in* 1990 U.S.C.C.A.N. pp. 267, 565, 598. Moreover, the legislative history suggests that even voluntary agreements to arbitrate were not intended to interfere with an individual's rights to sue in federal court. A committee report states:

> This amendment was adopted to encourage alternative means of dispute resolution that are already authorized by law. The Committee wishes to emphasize, however, that the use of alternative dispute resolution mechanisms is intended to supplement, not supplant, the remedies provided by this Act. Thus, for example, the Committee believes that any agreement to submit disputed issues to arbitration, whether in the context of a collective bargaining agreement or in an employment contract, does not preclude the affected person from seeking relief under the enforcement provisions of this Act. This view is consistent with the Supreme Court's interpretation of title VII of the Civil Rights Act of 1964,

whose remedial provisions are incorporated by reference in title I. The Committee believes that the approach articulated by the Supreme Court in *Alexander v. Gardner–Denver* applies equally to the ADA and does not intend that the inclusion of Section 513 be used to preclude rights and remedies that would otherwise be available to persons with disabilities.

H.R.Rep. No. 485, 101st Cong., 2d Sess., pt. 3, at 76–77 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 499–500. Hence, while the statutory language of the amendments suggests that voluntary arbitration may be appropriate in certain situations to resolve statutory discrimination claims, the legislative history undermines the notion that arbitration clauses contained in collective bargaining agreements may be utilized to prevent the judicial resolution of such claims without the consent of the affected employee. The Seventh Circuit rather colorfully discounted such a reading of the amendments:

> These provisions, a polite bow to the popularity of 'alternative dispute resolution' and perhaps a mild sop to the judiciary, which has expressed alarm at Congress's relentless expansion of the jurisdiction of the federal courts, encourage arbitration 'where appropriate'—and if we are right it is not appropriate when it is not agreed to by the worker but instead is merely imposed by a collective bargaining agreement that he may have opposed. Nothing in the background of the amendments is inconsistent with this interpretation. It would be at least a mild paradox for Congress, having in another amendment that it made to Title VII in 1991 conferred a right to trial by jury for the first time, to have empowered unions, in those same amendments, to prevent workers from obtaining jury trials in these cases. We know that statutes, being products of compromise, frequently reflect inconsistent aims. But if that is the case here, we might expect to find a hint of it in the statutory language or design, or in the legislative history, but we find none.

*Pryner,* 109 F.3d at 363 (citations omitted); *see Hill,* 952 F.Supp. at 406–07.

### 5. Application to the Case at Bar

With regard to the present action, this court is of the opinion that *Alexander* remains the controlling law, as this case arises in the context of an arbitration clause contained in a collective bargaining agreement. The statutory amendments, while encouraging arbitration "where appropriate," do not preclude an employee covered by a collective bargaining agreement from availing himself of a judicial forum for resolving employment discrimination claims brought under the ADA or Title VII. Therefore, Coleman may seek redress in federal court for alleged violations of these statutes independent of any contractual remedies he may have under the CBA. Although, in this instance, Coleman did not pursue his contractual remedies before bringing suit, as the Supreme Court noted in *Alexander*, "the actual submission of [the] grievance to arbitration ... does not alter the situation." 415 U.S. at 52, 94 S.Ct. at 1021; *see Brisentine*, 117 F.3d at 524; *Varner*, 94 F.3d at 1213. "[T]he same reasoning applies to a plaintiff who has chosen not to participate in the grievance procedure." *Id.* "Implicitly, the failure: of the worker to pursue a CBA's grievance procedure would change neither the concerns nor the holding of the [*Alexander*] case. Thus, the necessary extension of *Alexander* is that an employee may exercise his rights in either or both forums." *Hill*, 952 F.Supp. at 406.

The instant case possesses many of the "important distinctions" noted in *Gilmer* between the *Alexander* line of cases and the facts presented in Gilmer. See Gilmer, 500 U.S. at 35, 111 S.Ct. at 1656–57. First, while the CBA states in its preamble that "[t]here shall be no unlawful discrimination against any employee by the Company, Union, or any other employee because of race, color, disability, religion, age (over 40), sex, or national origin," the arbitration clause is not equally broad. The arbitration clause extends to "any dispute involving the proper application or interpretation of this Agreement, or a claim that an employee has been unreasonably and unjustly discriminated against." Notably, it does not expressly encompass a claim that an employee has been *unlawfully* discriminated against. It is well established, however, that unfair or arbitrary treatment by an employer is not prohibited by the federal anti-discrimination statutes unless it is based on one of the statutorily protected factors. *See, e.g., EEOC v. Louisiana Office of Community Servs.*, 47 F.3d 1438, 1448 (5th Cir.1995); *Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503, 1507–08 (5th Cir.1988); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181. 1187 (11th Cir.1984) (citing *Megill v. Board of Regents*, 541 F.2d 1073, 1077 (5th Cir. 1976)). Hence, an employer's action might constitute unreasonable and unjust discrimination without running afoul of federal statutes if the discrimination is based on factors other than those protected by federal law.

Moreover, retaliation against an employee for engaging in protected activity is proscribed by Title VII, but there is no mention of retaliation in the list of prohibited practices in the CBA. *See Brown*, 127 F.3d at 342. In addition, the CBA prohibits discrimination by other employees and the union, not just by the company. Yet, Title VII and other federal employment discrimination statutes prohibit discrimination by employers only and do not impose liability on individual employees. *See Stults v. Conoco, Inc.*, 76 F.3d 651, 655 (5th Cir.1996); *Grant v. Lone Star Co.*, 21 F.3d 649, 651–53 (5th Cir.), *cert. denied*, 513 U.S. 1015, 115 S.Ct. 574, 130 L.Ed.2d 491 (1994). Therefore, it cannot be said that the rights protected by the CBA and subsumed by the arbitration clause are coextensive with federal statutory rights. In any event, "[t]he contractual rights afforded by the CBA are wholly separate and independent from those statutory rights given to citizens by virtue of the ADA [and Title VII], though in many instances, a CBA may provide for a similar set of non-discriminatory rights." *Darby*, 1997 WL 88241, at *2.

More significantly, however, under the CBA, "the sole function of the arbitrators" is restricted to determining "whether Company or Union is correct with reference to the proper application and interpretation of this Agreement and the arbitrators shall not have any authority to change, amend, modify, supplement or otherwise alter in any respect whatsoever this Agreement, or any part

thereof." Thus, the arbitrators' authority is limited to questions of contract application and interpretation based on the language of the agreement and the "law of the shop." In *Alexander*, the Supreme Court recognized the inherent limitations of arbitrators:

> As the proctor of the bargain, the arbitrator's task is to effectuate the intent of the parties. His source of authority is the collective-bargaining agreement, and he must interpret and apply that agreement in accordance with the 'industrial common law of the shop' and the various needs and desires of the parties. The arbitrator, however, has no general authority to invoke public laws that conflict with the bargain between the parties.... If an arbitral decision is based 'solely upon the arbitrator's view of the requirements of enacted legislation,' rather than on an interpretation of the collective-bargaining agreement, the arbitrator has 'exceeded the scope of the submission,' and the award will not be enforced. Thus the arbitrator has authority to resolve only questions of contractual rights, and this authority remains regardless of whether certain contractual rights are similar to, or duplicative of, the substantive rights secured by Title VII.

415 U.S. at 53–54, 94 S.Ct. at 1022–23 (citations omitted). While *Gilmer* rejected *Alexander's* "general mistrust of the arbitral process," discussed in pages 1024 and 1025 of the *Alexander* opinion, this portion of the opinion addressing the limited authority of labor arbitrators remained intact. *See Gilmer*, 500 U.S. at 34 n. 5, 111 S.Ct. at 1656 n. 5.

In this instance, the arbitrators simply are not vested with the power to determine whether the company has violated federal employment discrimination statutes, as their authority is drawn solely from the CBA, not from external sources. *See Brisentine*, 117 F.3d at 524. As the Fourth Circuit commented in *Brown*:

> While it is true that the collective bargaining agreement in this case prohibits conduct similar to that prohibited by Title VII and by [other federal statutes], none of the substantive provisions in the agreement

reaches beyond the agreement to cover disputes arising under these laws. Thus, in interpreting the contract, there is no indication that the arbitrator would be bound to follow their interpretations.

*See* 127 F.3d at 342. Hence, because the CBA does not authorize the arbitrators to decide federal statutory claims, it is inappropriate to relegate Coleman to seeking redress for employment discrimination under the contractual grievance and arbitration procedure. If Coleman proves that he is a victim of unlawful employment discrimination, he is entitled to relief under the "law of the land," not merely the "law of the shop."

Second, as highlighted in *Gilmer*, perhaps the most important distinction in this case is that only the union, rather than the aggrieved employee, can invoke the contractual arbitration procedure. Thus, the employee "has to persuade the union to prosecute his grievance and if it loses in the early stages of the grievance proceedings to submit the grievance to arbitration." *Pryner*, 109 F.3d at 362; *see Bynes*, 944 F.Supp. at 487. As the Seventh Circuit noted in *Pryner*:

> [T]he union has broad discretion as to whether or not to prosecute a grievance. It may take into account tactical and strategic factors such as its limited resources and consequent need to establish priorities, just as other 'prosecutors' must do, as well as its desire to maintain harmonious relations among the workers and between them and the employer.

*Id.* at 362. In addition, the union is obligated to bear half the cost of arbitration, which gives it an incentive against pressing claims to arbitration. *See Brisentine*, 117 F.3d at 525. Thus, due to the difference between contractual rights under a collective bargaining agreement and individual statutory rights, there is a "potential disparity in interests between a union and an employee" regarding the prosecution of the employee's individual statutory rights. *Gilmer*, 500 U.S. at 20, 111 S.Ct. at 1648–49; *see Brisentine*, 117 F.3d at 525. As the court noted in *Bynes*, "unlike the securities registration cases, [the plaintiff] here did not individually consent to forego [his] remedy under Title VII in exchange for mandatory arbitration.

[He is] at the mercy and whim of [his] union representatives who may be pursuing an agenda which benefits solely the majority of union members." 944 F.Supp. at 487. The Supreme Court recognized in *Barrentine,* "even if the employee's claim were meritorious, his union might, without breaching its duty of fair representation, reasonably and in good faith decide not to support the claim vigorously in arbitration." 450 U.S. at 742, 101 S.Ct. at 1446. Thus, if a union chose not to proceed to arbitration, under HL&P's proposed extension of *Gilmer,* the employee would have no forum in which to raise his statutory discrimination claim. *See Bush,* 940 F.Supp. at 1045.

In *Gilmer,* the Supreme Court reiterated its concern, previously expressed in *Alexander,* that "in collective-bargaining arbitration 'the interests of the individual employee may be subordinated to the collective interests of all employees in the bargaining unit.'" *Gilmer,* 500 U.S. at 34, 111 S.Ct. at 1656 (quoting *Alexander,* 415 U.S. at 58 n. 19, 94 S.Ct. at 1024 n. 19). The Seventh Circuit elaborated:

> The essential conflict is between majority and minority rights. The collective bargaining agreement is the symbol and reality of a majoritarian conception of workers' rights. An agreement negotiated by the union elected by a majority of the workers in the bargaining unit binds all the members of the unit, whether they are part of the majority or for that matter even members of the union entitled to vote for union leaders-they need not be. The statutory rights at issue in these two cases are rights given to members of minority groups because of concern about the mistreatment ... of minorities by majorities. We may assume that the union will not engage in actionable discrimination against minority workers. But we may not assume that it will be highly sensitive to their special interests, which are the interests protected by Title VII and the other discrimination statutes, and will seek to vindicate those interests with maximum vigor. The employers' position delivers the enforcement of the rights of these minorities into the hands of the majority, and we do not think that this result is consis-

tent with the policy of these statutes or justified by the abstract desirability of allowing unions and employers to cut their own deals.

*Pryner,* 109 F.3d at 362–63 (citations omitted). "'Nothing in *Gilmer* suggests that the Court abandoned its concern about the inherent conflicts between group goals and individual rights that exist in the give-and-take of the collective bargaining process.'" *Harrison,* 112 F.3d at 1451–52 (quoting *Randolph v. Cooper Indus.,* 879 F.Supp. 518, 521 (W.D.Pa.1994)).

In contrast, where an individual contractual undertaking is involved and the plaintiff may unilaterally invoke the arbitration process, as in *Gilmer, Miller, Rojas, Williams,* and *Alford,* any concern about the "tension between collective representation and individual statutory rights" is eliminated. *See Gilmer,* 500 U.S. at 35, 111 S.Ct. at 1656–57 In this situation, however, where only the union has the ability to pursue arbitration, it is improper to mandate that an employee forsake his statutory right to seek judicial relief for individual claims of employment discrimination in favor of the possibility that the union will determine that the collective good would be served by arbitrating his grievances. As the court observed in *Hill:*

> When an individual can represent himself or choose his own agent in an arbitration to which he submitted, the alternative forum may be both efficient and fair. It is when the individual needs and rights of a disabled worker, who is requesting treatment different from the rest, that it is inappropriate to require an employee to submit to the will of his union and its agreement with the company.

952 F.Supp. at 408. Under these circumstances, requiring Coleman to look to the CBA as his exclusive remedy for employment discrimination places too great a burden on the exercise of his statutory rights under the ADA and Title VII.

The final distinction pointed out in *Gilmer,* the applicability of the FAA, also exists in the instant case. 500 U.S. at 35, 111 S.Ct. at 1656–57. Here, as in *Alexander, Barrentine,* and *McDonald,* HL&P does not rely on the

FAA, whereas the arbitration agreements in *Gilmer, Miller, Rojas, Williams,* and *Alford* were held to be enforceable under the FAA. While the Supreme Court has not decided whether collective bargaining agreements are subject to the FAA, the Fifth Circuit, as discussed above, has held that the FAA "does not authorize the judicial enforcement of a contractual undertaking to submit to arbitration grievances arising under a collective bargaining agreement." *Lincoln Mills,* 230 F.2d at 86; *see Miller,* 121 F.3d at 218; *see also Brisentine,* 117 F.3d at 525; *Harrison,* 112 F.3d at 1454; *American Postal Workers Union v. United States Postal Serv.,* 823 F.2d 466, 473 (11th Cir.1987); *Bynes,* 944 F.Supp. at 487. Hence, precedent holding that employees are obligated to arbitrate their employment discrimination claims under the FAA, rather than pursue them in federal court, is inapposite in this context.

In summary, this court concurs with the *Pryner* court that "[t]he conservative reading of *Gilmer* is that it just pruned some *dicta* from *Alexander*—and it certainly cannot be taken to hold that collective bargaining agreements can compel the arbitration of statutory rights. That issue was not before the Court or discussed by it." 109 F.3d at 365. Like the Seventh Circuit, this court is "timid about declaring decisions by the Supreme Court overruled when the Court has not said so." *Id.* Therefore, this court is of the view that *Alexander* remains good law where an employee's only obligation to arbitrate is contained in a collective bargaining agreement. *See Penny,* 128 F.3d at 413–14; *Harrison,* 112 F.3d at 1453. Thus, as the Eleventh Circuit held in *Brisentine,* "[u]nless and until the Supreme Court overrules *Alexander,* we are bound to apply that decision to a case like this one that involves an exclusive remedy arbitration clause in a collective bargaining agreement under which the arbitrator is limited to resolving contractual claims, and the employee-claimant is not empowered to insist that his claim be arbitrated." 117 F.3d at 526.

Therefore, Coleman has not waived his individual federal statutory rights under the ADA and Title VII by failing to exhaust the grievance and arbitration procedure contained in the CBA. As a result, summary judgment for HL&P is not warranted. Coleman may continue to pursue his claims of race and disability discrimination in this court.

III. *Conclusion*

Accordingly, HL&P's Motion for Summary Judgment for failure to exhaust administrative remedies is DENIED.

IT IS SO ORDERED.